**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4078-15T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DEMETRIUS CORVIL, a/k/a
DEMETRUIS CORVIL,

    Defendant-Appellant.

_____

        Submitted November 29, 2018 – Decided August 1, 2019

        Before Judges O'Connor, Whipple and DeAlmeida.

        On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 13-05-0480.

        Joseph E. Krakora, Public Defender, attorney for appellant (Susan Brody, Deputy Public Defender, of counsel and on the brief).

        Michael A. Monahan, Acting Union County Prosecutor, attorney for respondent (Milton Samuel Leibowitz, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

        Appellant filed a pro se supplemental brief.

PER CURIAM

Following a jury trial, defendant Demetrius Corvil was found guilty of one count of first-degree robbery, N.J.S.A. 2C:15-1; two counts of second-degree kidnapping, N.J.S.A. 2C:13-1(a); two counts of second-degree kidnapping, N.J.S.A. 2C:13-1(b); one count of second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); one count of second-degree burglary, N.J.S.A. 2C:18-2; five counts of third-degree criminal restraint, N.J.S.A. 2C:13-2(a); two counts of third-degree terroristic threats, N.J.S.A. 2C:12-3(b); seven counts of fourth-degree aggravated assault, N.J.S.A. 2C:12-1(b)(4); and one count of fourth-degree unlawful possession of an imitation firearm, N.J.S.A. 2C:39-4(e). After the appropriate mergers, defendant was sentenced in the aggregate to a discretionary extended term of imprisonment of twenty-three years, subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2.

Defendant appeals from his conviction and sentence. In his counsel's brief, defendant raises the following points for our consideration:

> POINT I: THE COURT ERRED IN REFUSING TO BAR RETRIAL BASED ON PRINCIPLES OF DOUBLE JEOPARDY.
>
> POINT II: BECAUSE THE COURT'S JURY INSTRUCTION ON ROBBERY PROVIDED

CONFLICTING DEFINITIONS OF THE TERM "DEADLY WEAPON," THAT CONVICTION MUST BE AMENDED TO ONE OF SECOND-DEGREE ROBBERY. (Not raised below).

POINT III: THE 23-YEAR TERM IMPOSED ON THE ROBBERY CHARGE SUBJECT TO THE NO EARLY RELEASE ACT WAS MANIFESTLY EXCESSIVE.

Additionally, defendant advances the following points in a pro se supplemental brief:

POINT I: THE IN-COURT AND OUT-OF-COURT IDENTIFICATION OF DEFENDANT BY OFFICER SILVA SHOULD HAVE BEEN EXCLUDED BECAUSE THE SINGLE-PHOTO IDENTIFICATION WAS SO IMPERMISSIBLY SUGGESTIVE THAT IT GAVE RISE TO A SUBSTANTIAL LIKELIHOOD OF IRREPARABLE MISIDENTIFICATION; TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO SEEK A WADE HEARING; AND THE TRIAL COURT ERRED BY FAILING TO INCLUDE OFFICER SILVA'S IDENTIFICATIONS IN ITS INSTRUCTION TO THE JURY ON HOW TO ASSESS IDENTIFICATION TESTIMONY. (Not raised below).

a. The In-Court Identification of Defendant by Officer Silva Should Have Been Excluded.

b. Trial Counsel Provided Ineffective Assistance by Failing to Seek a Wade Hearing.

c. The Trial Court Committed Reversible Error by Failing to Instruct the Jury to Carefully

3

Scrutinize Officer Silva's In-Court and Out-Of-Court Identifications.

POINT II:  THE DEFENDANT'S RIGHT TO A FAIR TRIAL WAS VIOLATED BY THE PROSECUTOR'S REFERENCE TO HIM BEING A PRISONER DURING QUESTIONING OF A STATE WITNESS AND BY THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY THAT NO ADVERSE INFERENCE SHOULD BE DRAWN FROM THE FACT OF DEFENDANT'S INCARCERATION.  (Not raised below).

    a.  The Prosecutor's Reference to Defendant Being a Prisoner.

    b.  The Trial Court's Failure to Provide a Cautionary Instruction.

POINT III:  THE DEFENDANT WAS DENIED DUE PROCESS OF LAW AND A FAIR TRIAL BY THE INTRODUCTION OF EXPERT TESTIMONY THAT DID NOT MEET THE SUPREME COURT'S CRITERIA FOR RELIABILITY.  (Not raised below).

POINT IV: THE STATE'S FAILURE TO PRESERVE EXCULPATORY EVIDENCE OF THE GLOVES TURNED OVER TO POLICE BY ONE OF THE VICTIMS, AS WELL AS SURVEILLANCE FOOTAGE AT BOB'S PHARMACY DEPICTING TWO INDIVIDUALS MATCHING THE SUSPECTS' DESCRIPTIONS FLEEING FROM THE SCENE OF THE CRIME, VIOLATES DUE PROCESS AND REQUIRES DISMISSAL OF THE INDICTMENT WITH PREJUDICE, AND THE TRIAL COURT'S FAILURE TO PROVIDE THE JURY WITH AN ADVERSE INFERENCE SPOLIATION CHARGE

4

VIOLATED THE DEFENDANT'S RIGHT TO A
FAIR TRIAL.  (Not raised below).

   a.  The State's Failure to Preserve Exculpatory
   Evidence Requires Dismissal of the Indictment
   with Prejudice.

   b.  The Trial Court's Failure to Provide The Jury
   with an Adverse Inference Spoliation Charge
   Violated the Defendant's Right to a Fair Trial.

POINT V:  THE DEFENDANT'S RIGHTS TO DUE
PROCESS OF LAW AS GUARANTEED BY THE
FOURTEENTH AMENDMENT TO THE UNITED
STATES CONSTITUTION AND ARTICLE I,
PARAGRAPH 1 OF THE NEW JERSEY
CONSTITUTION WAS VIOLATED BY THE TRIAL
COURT'S FAILURE TO RECORD SIDEBAR
CONFERENCES.

POINT VI:  EVIDENCE OF A SLEEPING JUROR
VIOLATED DEFENDANT'S FEDERAL AND
STATE CONSTITUTIONAL RIGHTS TO DUE
PROCESS AND AN "IMPARTIAL AND
MENTALLY COMPETENT" TRIBUNAL AND THE
TRIAL COURT'S FAILURE TO VOIR DIRE THE
ALLEGEDLY SLEEPING JUROR AMOUNTED TO
AN ABUSE OF DISCRETION.  (Not raised below).

POINT VII: THE DEFENDANT'S RIGHT TO DUE
PROCESS AND TO CONFRONT THE WITNESSES
AGAINST HIM WAS VIOLATED BY THE STATE'S
ABUSE OF THE RULE ALLOWING WRITINGS TO
REFRESH A WITNESS' MEMORY.

Having reviewed the briefs, record and applicable legal principles, we

affirm the conviction and sentence in all respects.

5

I

The salient evidence adduced at trial was as follows. On October 31, 2011, J.R. and his girlfriend, S.R., had a number of J.R.'s family members in their home in Elizabeth for the weekend in order to celebrate his birthday.[1] At approximately 9:00 a.m., a man later identified as defendant knocked on the door, holding a gift bag and a balloon. When one of the guests opened the door, defendant punched the guest in the head, causing the guest to fall. Before defendant struck him, the guest saw defendant's face.

Defendant then donned a ski mask, pointed a gun at the guest, and entered the house with another man, who was wearing a mask on which was the image of a skull or skeleton.[2] This man, suspected of being Jesus Velasquez, was charged with various offenses along with defendant, but Velasquez was ultimately acquitted of all charges. For purposes of this opinion, we refer to the man who entered the house with defendant as the "second intruder."

The men pointed a gun at the guests on the first floor and ordered them to lie face down. The second intruder went upstairs into J.R. and S.R.'s bedroom, where they were still sleeping, pointed a gun at them, told them they were being

_____

[1] We use initials to protect the privacy of the victims.

[2] This gun was later recovered and determined to be a starter pistol.

A-4078-15T4

robbed, and ordered them to go downstairs. They complied and, when they got to the first floor, lay on the floor face down with the other guests.

The men asked J.R. where he kept his money, and he replied it was in a safe upstairs. Defendant ordered J.R. to go back upstairs, while the second intruder remained behind. After defendant and J.R. went upstairs, J.R. hesitated before he opened the safe. Defendant beat J.R. with a gun on the back of his skull until he opened the safe. J.R. handed the money in the safe, which contained approximately $74,000 in cash, to defendant. J.R. was brought back downstairs and questioned about whether there was any other money in the house. While questioned, J.R. was struck about the head with a gun, and one of the men put a gun to the back of S.R.'s head. J.R. told the intruders there was not any other money in the house.

Meanwhile, a guest in the house, who had escaped the intruders' detection, climbed out of a bathroom window, ran to a local store, and told the owner to call the police. As a result of that call, police officers Matthew Williams and Ina Silva of the Elizabeth Police Department responded to the scene. Williams entered the home and searched the house for suspects, while Silva went to the rear of the house. She saw a heavyset black male wearing black clothes run out

7

of the back door. Silva chased him, but was unable to keep up and headed back toward the house.

While returning to the house, Silva saw the other suspect, subsequently determined to be defendant, in an alley near the house. She and Williams pursued him and two other police officers, Meagher and Streep, managed to apprehend him at the rear of a pharmacy and place him under arrest.

Following defendant's arrest, near J.R.'s house the police recovered a starter pistol from a garbage can and a ski mask in a back yard. A mask with a skull on it was found in another yard in the neighborhood. DNA obtained from the ski mask matched that provided by defendant through a buccal swab.

Defendant and Velasquez were tried together. After the trial commenced, co-defendant's counsel advised the court she intended to call assistant prosecutor Colleen Ruppert to testify about the contents of a memorandum she had drafted in 2012, when she had last worked on the case, because the contents of that memorandum suggested other parties may have been the perpetrators. The court permitted co-defendant to call Ruppert as a witness.

A copy of the memorandum was not provided in the record, but colloquy between court and counsel revealed the memorandum referenced that either J.R. or S.R. told the State that two of their neighbors had told them that they had seen

two men and a woman outside of J.R.'s house during the early morning hours of October 31, 2011.

During a sidebar conference while Ruppert was on the witness stand, defendants indicated they had not been made aware of the fact that the neighbors also reported the two men and the woman were in a car when outside of the victims' home. The record is unclear, but the comments of counsel indicate there was a document other than Ruppert's memorandum that contained the information about the two men and the woman being in a car. Co-defendant's counsel admitted the State had revealed to defendants that J.R. and S.R. had advised the State their neighbors noticed two men and a woman around the victim's house in the early morning hours of the day of the robbery. However, counsel represented to the court that the "idea that there was a car with three occupants in it" was not.

The prosecutor clarified it was actually S.R., not J.R., who had provided the information about the neighbors, and that the State had only learned about the fact the two men and one women may have been in a car just before the trial began. The prosecutor argued both defendants had previously known about the two males and a female and, in the prosecutor's opinion, "[w]hether or not [the men and the woman] were on foot or in a car, it's immaterial." The prosecutor

further commented the State was unable to find out who the neighbors were and, thus, could not confirm the existence of a car. Finally, he noted there was nothing that precluded either defendant from speaking to S.R. about what she learned from the neighbors.

Defendant requested and the court granted a mistrial, because the information the State learned just before trial from S.R., specifically, that the neighbors may have seen the two men and a woman in a car, could have altered defendant's trial strategy. Specifically, the court noted that if defendant had been provided such information by the State, he may have asserted a third party or parties committed the subject crimes.

Just before jury selection on the retrial, defendant unsuccessfully moved to dismiss the indictment on double-jeopardy grounds, pursuant to N.J.S.A. 2C:1-9. The retrial proceeded to conclusion. As previously stated, the jury convicted defendant of, among other things, first-degree robbery, and he was sentenced in the aggregate to a twenty-three year term of imprisonment. The co-defendant was acquitted of all charges.

II

A

On appeal, defendant contends the trial court erred when it denied his motion to dismiss the indictment on double-jeopardy grounds.

The law governing the dismissal of an indictment when a mistrial has been granted at a defendant's request is grounded in principles of double jeopardy embodied in the Fifth Amendment of the Federal Constitution and Paragraph 11, Article I, of the New Jersey Constitution. State v. Torres, 328 N.J. Super. 77, 85-92 (App. Div. 2000). A defendant has two options when prosecutorial error has occurred. Oregon v. Kennedy, 456 U.S. 667, 676-77 (1982).

The first option is to proceed to verdict, appeal and, if successful, face retrial. The second option is to request a mistrial and take advantage of some of the benefits provided under the "Double Jeopardy Clause the freedom from extended anxiety, and the necessity to confront the government's case only once — [that] would be to a large extent lost in the process of trial to verdict, reversal on appeal, and subsequent retrial." Ibid. But when a defendant obtains a mistrial, retrial is not barred unless "the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial." Id. at 676.

11

Our courts apply the Oregon v. Kennedy standard under the federal and State constitutions. Torres, 328 N.J. Super. at 92; State v. Cooper, 307 N.J. Super. 196, 202-03 (App. Div. 1997). Under Oregon v. Kennedy's test, direct evidence of the government's intent to goad is not required. It may be inferred from the "objective facts and circumstances" of the case. Kennedy, 456 U.S. at 675.

In Torres, we identified objective factors to be considered in "determining whether or not a prosecutor's misconduct was intended to provoke a mistrial." Torres, 328 N.J. Super. at 88. These factors are: "(1) whether there was a sequence of overreaching or error prior to the error resulting in the mistrial, (2) whether the prosecutor resisted the motion for a mistrial, (3) whether the prosecutor testified, and the court below found, that there was no intent to cause a mistrial, and (4) the timing of the error." Ibid. (citing Kennedy, 456 U.S. at 680 (Powell, J., concurring)). Not all of the factors are necessarily implicated or probative in each case. The necessary inquiry is whether the objective facts and circumstances of the case tend to support or negate an inference the State provoked a defendant's request for mistrial.

Here, defendant maintains the prosecutor knew he possessed potentially exculpatory information, specifically, that neighbors informed S.R. that the two

men and the woman observed to be outside of J.R. and S.R.'s residence just before the robbery were in a car, not on foot, and that the State withheld such information so defendant would request a mistrial. However, defendant concedes such conduct may not rise to the level of deliberately goading a mistrial.

The trial court found the assistant prosecutor did not intend to provoke defendant into requesting a mistrial. The court stated:

> In the present matter, the State failed to turn over some evidence which this [c]ourt finds was a good faith error. . . .
>
>     . . . .
>
> [T]he State's attorney said, well, we were looking at information and had some information about a car which we weren't able to verify and the neighbors that may have given that information are in the wind. They're no longer able to be found so to us it was essentially speculative and not material because there wasn't anything that we could determine. [However,] . . . [defendants] knew in discovery that [the] neighbors had existed . . . .
>
> Defense then brought to question saying, wait a minute, we don't see anything . . . in [Ruppert's] memo about a car . . . and that's what preempted the mistrial being filed by [defendant] to look into this matter and indicating to the court at the time that . . . [defendant] may have opened differently. [Defendant] didn't necessarily open to a third party defense but this information about a car may [have] present[ed] it. So

13

in order to give the defendant all the benefit of the doubt, the court granted the [mistrial] motion at the time.

However, in granting the motion, the [c]ourt understood that [the] defense should have the time to explore these further developments and maybe develop that third party defense. . . . And it came out that after the mistrial, in interviewing certain people and trying to connect who knew who, that those ultimate neighbors, which no longer live at the address, were able to be contacted and identified and questioned.

So, it didn't appear that it was, per se, exculpatory information. The State had turned over everything it believed in good faith it was required to turn over. . . . I didn't see anything demonstrated by [the prosecutor] throughout this trial that would have called his ethical obligations into question.

        . . . .

[T]he prosecutor . . . in this case did, in this court's opinion, sufficiently explain that he did overlook information. He believed it was unimportant. He wasn't trying to slip anything by anybody or do anything that would have been, you know, behind anybody's back. The act itself was a mistake, was an error, was inadvertence, it was negligence. It wasn't part of a strategy that he had. It wasn't, in any way, intended to goad the defendants into requesting any type of mistrial.

Once the trial court found the prosecutor did not intend to provoke a mistrial request, the court was required to deny the motion to dismiss the

indictment. Even "[p]rosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, . . . does not bar retrial absent" intent to deprive the defendant of his right to decide whether the charges will be adjudicated in one proceeding. Kennedy, 456 U.S. at 675-76.

Here, the consideration of the four factors a court is to use when evaluating whether a prosecutor's conduct was intended to goad a defendant into seeking a mistrial supports the trial court's conclusion. As for the first factor, there is no evidence of a sequence of overreaching or error prior to the error resulting in the mistrial. Defendant does not even allege the State withheld any discovery other than that the two men and the woman may have been in a vehicle. As for the second factor, the State vigorously resisted defendant's motion for a mistrial.

Regarding the third factor, the assistant prosecutor did not testify, but there are sound reasons in the record to conclude the failure to turn over the subject evidence was inadvertent. Further, we note the State had turned over all evidence except for evidence the two men and the woman may have been sitting in a car. Defendant knew that J.R. or S.R. had advised the State their neighbors saw the two men and the woman near the victims' home just before the crimes

15

occurred. Defendant could have but did not question J.R. or S.R. and follow-up with the neighbors to obtain additional details.

As for the fourth factor, defendant sought a mistrial just after the State had rested and defendant elected not to testify. The evidence against defendant was very strong, if not overwhelming, in light of the fact the DNA found in the ski mask discovered close to the victims' home very soon after the incident matched defendant's.

Weighing these factors, we agree with the trial court that the prosecutor did not intend to provoke or goad defendant into requesting a mistrial. Therefore, the retrial was not barred.

B

Defendant next attacks the quality of the jury charge. His principal contention is the jury instruction on robbery was defective because the court provided conflicting definitions of the term "deadly weapon." Defendant did not raise this issue before the trial court. He argues the only remedy is to amend the conviction for robbery from a first-degree to a second-degree offense.

The court's instruction on the meaning of "deadly weapon" was:

> A "deadly weapon" is any firearm or other weapon, device, instrument, material or substance, whether animate or inanimate, which in the manner it is used, or intended to be used, is known to be capable of

16

producing death or serious bodily injury, <u>or which in the manner it is fashioned would lead the victim reasonably to believe that it's capable of producing death or serious bodily injury.</u>

[(Emphasis added).]

Defendant acknowledges the above definition of "deadly weapon" is correct, because it properly explains that an imitation firearm may be a deadly weapon. However, thereafter, the court explained the difference between first- and second-degree robbery and then instructed:

> In this case, the State must prove beyond a reasonable doubt that the defendants were armed with, used or threatened immediate use of a deadly weapon while in the course of committing the robbery. "Armed with a deadly weapon" means that the defendant possessed and had immediate access to a deadly weapon. <u>A "deadly weapon" is any firearm or other weapon, device, material or substance, whether animate or inanimate, which in the manner which it is used, or intended to be used, is known to be capable of producing death or serious bodily injury.</u>

[(Emphasis added.)].

Defendant notes that in the above portion of the charge, the court did not include in its definition of "deadly weapon" reference to an object "which in the manner it is fashioned would lead the victim reasonably to believe that it's capable of producing death or serious bodily injury." Defendant does concede that, thereafter, when the court used the term "deadly weapon," the court added

17

the language "or imitation thereof."  For example, in one portion of the charge the court instructed:

> If you find the State has proven beyond a reasonable doubt that the defendant Demetrius Corvil and/or defendant Jesus Velasquez committed the crime of robbery and was armed with a deadly weapon, or used or threatened immediate use of a deadly weapon <u>or imitation thereof</u> at the time of the commission of the robbery, then you must find defendant Demetrius Corvil and/or defendant Jesus Velasquez guilty of robbery in the first degree.
>
> [(Emphasis added).]

However, defendant argues the above instruction and wherever else the court made reference to a "deadly weapon or imitation thereof" was nevertheless defective because the court did not define the term "imitation."

When a defendant fails to object to a jury charge, we review for plain error, and "disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'"  State v. Funderburg, 225 N.J. 66, 79 (2016) (quoting R. 2:10-2).  In addition, "[t]he error must be considered in light of the entire charge and must be evaluated in light 'of the overall strength of the State's case.'"  State v. Walker, 203 N.J. 73, 90 (2010) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)).  "Without an objection at the time a jury instruction is given, 'there is a presumption that the charge was

not error and was unlikely to prejudice the defendant's case.'" State v. Montalvo, 229 N.J. 300, 320 (2017) (quoting State v. Singleton, 211 N.J. 157, 182 (2012)).

Here, the court defined the term deadly weapon, instructing such a weapon includes any device or instrument "which in the manner it is fashioned would lead the victim reasonably to believe that it is capable of producing death or serious bodily injury." The court omitted the latter language in one section of the charge in which the court referenced the meaning of deadly weapon. However, after that one omission, the court's repeated use of the term "deadly weapon or imitation firearm" served to inform the jury the court's initial definition of deadly weapon, which essentially includes objects that appear to be firearms, was the definition to which it was to adhere. In our view, considering it as a whole, the charge was not clearly capable of producing an unjust result.

C

Defendant claims trial counsel was ineffective for failing to request a Wade[3] hearing. In addition, for the first time on appeal, defendant contends Officer Silva's out-of-court and in-court identifications of him should have been

---

[3] United States v. Wade, 388 U.S. 218 (1967).

<span>A-4078-15T4</span>

excluded, and that the trial court erred when it failed to instruct the jury on "how to assess identification testimony." We reject these contentions.

Generally, ineffective assistance of counsel claims are not considered on direct appeal because they "involve allegations and evidence that lie outside the trial record." State v. Preciose, 129 N.J. 451, 460 (1992). However, a reviewing court may consider such a claim on direct appeal "when the trial itself provides an adequately developed record . . . ." State v. Castagna, 187 N.J. 293, 313 (2006) (citing State v. Allah, 170 N.J. 269, 285 (2002)). Here, the record is sufficiently developed. We readily dispense with and reject defendant's claim trial counsel was ineffective because he failed to request a Wade hearing. Specifically, Silva did not make an out-of-court identification of defendant. Thus, there would not have been any reason for trial counsel to seek a Wade hearing.

During the course of her testimony, Silva identified defendant as the person arrested by the police. Defendant fails to provide a reason that supports his premise Silva's in-court identification was the product of any error or misconduct on the part of the police. Even if her in-court identification were, her testimony was immaterial. First, the fact Silva testified she saw defendant being arrested is not probative of the fact he committed a crime.

Second, defendant does not challenge Officer Williams and Meagher's testimony that they apprehended and arrested defendant. Third, the evidence against defendant was very strong. Defendant's DNA matched that found in the ski mask recovered near the scene of the incident, and the ski mask fit the description of one of the masks worn by one of the intruders.

Defendant's contention the court failed to properly instruct the jury on how to "assess identification testimony" is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

D

Defendant claims his right to a fair trial was violated because of references to him as a prisoner during the trial and the court's failure to provide a curative instruction. Specifically, during his direct examination, the State asked Officer Williams what occurred after defendant's arrest. Williams responded, "Usually [they] process the prisoner or process clothing that might have to be tagged." When the State asked him if S-204 was a shirt worn by "prisoner Corvil," Williams responded in the affirmative.

Defendant did not object to Williams's testimony or request a curative instruction. The State concedes both its and Williams's reference to defendant

as a prisoner was inappropriate, but maintains the State's actions constituted harmless error. We agree.

Although characterizing defendant as a prisoner was improper, these two references in this lengthy trial were fleeting and, in context, not prejudicial to defendant. It was obvious defendant was labeled as such because he had just been arrested and was being detained for the subject offenses, not because he was serving a sentence for a prior crime. The errors were harmless and do not, as defendant contends, require a reversal of his convictions.

E

Defendant maintains his sentence of imprisonment for twenty-three years in the aggregate is excessive. Specifically, defendant was sentenced to the following terms of imprisonment: twenty-three years for first-degree robbery, N.J.S.A. 2C:15-1; eight years for second-degree kidnapping, N.J.S.A. 2C:13-1(a); five years for second-degree kidnapping, N.J.S.A. 2C:13-1(b); eight years for second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); nine years for second-degree burglary, N.J.S.A. 2C:18-2; five years for third-degree criminal restraint, N.J.S.A. 2C:13-2(a); ten years for third-degree terroristic threats, N.J.S.A. 2C:12-3(b); eighteen months for fourth-degree aggravated assault,

N.J.S.A. 2C:12-1(b)(4); and eighteen months for fourth-degree unlawful possession of an imitation firearm, N.J.S.A. 2C:39-4(e).

Defendant was found to be discretionary extended term eligible on the robbery charge as a persistent offender, pursuant to N.J.S.A. 2C:44-3. At the sentencing hearing, the State requested an aggregate sentence of sixty-five years; defendant contended a sentence in the range of twenty to twenty-five years was appropriate. On appeal, defendant does not claim the court abused its discretion in imposing the extended term; his argument is the term of years imposed was excessive.

At sentencing, the court noted defendant was thirty-four years of age when he committed the subject offenses, had previous convictions that resulted in five separate prison terms, and had violated parole four times. The court found aggravating factors three, six, and nine applied, see N.J.S.A. 2C:44-1(a), that there were no mitigating factors, see N.J.S.A. 2C:44-1(b), and that the aggravating factors outweighed the nonexistent mitigating factors.

We have examined the record in light of defendant's argument. Defendant received an extended sentence, to which he does not object, and the court ordered that all of his sentences run concurrently to the sentence imposed for first-degree robbery. The aggregate sentence imposed is just three years above

the maximum that may be ordered for a first-degree offense, and it is not disputed the court did not err by imposing an extended term. In our view, the sentence was not manifestly excessive and does not shock our judicial conscience. See State v. Bieniek, 200 N.J. 601, 608 (2010) (citing State v. Roth, 95 N.J. 334, 364-65 (1984)).

F

We have considered defendant's remaining arguments, and conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION